Jose J. OLAGUES, on behalf of himself
and all others similarly situated,
Plaintiffs-Appellants,

v.

Joseph P. RUSSONIELLO, individually
and in his capacity as United States
Attorney for the Northern District of
California, et al., Defendants-Appellees.

Jose J. OLAGUES, on behalf of himself
and all others similarly situated; His-
panic Coalition for Human Rights, Chi-
nese for Affirmative Action, and San
Francisco Latino Voter Registration
Education Project, Plaintiffs-Appel-
lants,

v.

Joseph P. RUSSONIELLO, individually
and in his capacity as United States
Attorney for the Northern District of
California; O'Malley, William A., indi-
vidually and in his capacity as District
Attorney for Santa Clara County; Un-
derwood, Lon, Individually and in his
capacity as registrar of voters for Con-
tra Costa County; Smith, Arlo, individ-
ually and in his capacity as District
Attorney for San Francisco County, et
al., Defendants-Appellees.

Nos. 82–4427, 83–2581.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 29, 1986.

Decided Aug. 26, 1986.

Before BROWNING, Chief Judge, and WALLACE, SNEED, HUG, TANG, SKOPIL, SCHROEDER, PREGERSON, ALARCON, FERGUSON, and BEEZER, Circuit Judges.

PREGERSON, Circuit Judge.

Jose Olagues and various organizations promoting the voting rights of Chinese Americans and Hispanic Americans in the San Francisco Bay area filed a class action suit against the United States Attorney for the Northern District of California and various other government officials for damages, and declaratory and injunctive relief. Olagues and the organizations allege that a voter registration fraud investigation conducted by the United States Attorney violated the Voting Rights Act and the first, fifth, fourteenth, and fifteenth amendments to the United States Constitution.

The district court dismissed the injunctive claims on the ground that it lacked jurisdiction to enjoin an investigation by a United States Attorney. Subsequently, the court granted summary judgment in favor of the United States Attorney and the other government officials on the remaining declaratory judgment and damage claims.

The appellants contend, *inter alia,* that the district court erred in dismissing their injunctive relief claim and in granting summary judgment for the government officials on the appellants' claims for damages and declaratory relief.

We affirm in part and reverse in part.

Joaquin G. Avila, Ronald T. Vera, Alan L. Schlosser, American Civil Liberties Union, San Francisco, Cal., and Kathleen A. Pool, California Rural Legal Assistance, Marysville, Cal., for plaintiffs-appellants.

William T. McGivern, and John D. O'Connor, Tarkington, Carey, O'Connor & O'Neill, San Francisco, Cal., for defendants-appellees.

## BACKGROUND

On April 19, 1982, three weeks before the voter registration deadline for the 1982 California primary election, the United States Attorney for the Northern District of California, Joseph P. Russoniello, commenced an investigation of foreign-born voters who requested bilingual ballots in nine San Francisco Bay Area counties.[1] In

---

1. The counties were Alameda, Monterey, Napa, San Francisco, San Mateo, Santa Clara, Santa Cruz, Contra Costa, and Sonoma.

all nine counties affected by the investigation, voting materials were available pursuant to federal law in both Spanish and English. *See* 42 U.S.C. § 1973aa–1a. In San Francisco County, they were also available in Chinese.

Russoniello sent a letter requesting the district attorneys of each of the nine counties to send him the names of twenty-five randomly selected recently registered, foreign-born voters who requested bilingual ballots so that the Immigration and Naturalization Service (INS) could verify the citizenship status of those individuals. The letter stated that further investigation would be undertaken of those not positively identified as United States citizens. In addition, the letter stated that although Russoniello did not intend to prosecute ineligible registered voters under federal law, county officials could prosecute them under the California Elections Code. Russoniello's letter also stated that he would seriously consider prosecuting any group or individual who fraudulently registered the ineligible voters.

The impetus for the secret investigation came from Russoniello's review of two reports prepared by Santa Clara County's District Attorney that summarized an investigation of foreign-born voters in Santa Clara County. The investigation focused on all foreign-born voters in the Fifth District of the City of San Jose and uncovered some cases where non-citizens had been registered to vote.

In stating his reasons for targeting only Spanish-speaking and Chinese-speaking foreign-born voters, Russoniello referred to voter registration drives recently undertaken to register those voters and the fact that the Spanish language voter registration materials did not accurately translate the requirement that a voter must be a citizen.[2] Russoniello believed that individuals who requested bilingual ballots were more susceptible to being confused or misled about voter eligibility. He was concerned that if there was widespread illegal registration, the upcoming elections would be subject to challenge.

All of the district attorneys and registrars of voters of the nine counties cooperated and sent the names Russoniello had requested. Olagues and others in the plaintiff class were among the persons investigated.[3]

When information concerning the investigation became public, a variety of individuals expressed concern that the timing of the investigation and its focus on particular racial groups would have an intimidating effect on their right to vote.[4] Despite these concerns Russoniello persisted in the investigation.

On May 12, 1982, appellants Jose Olagues, the Hispanic Coalition for Human Rights, Chinese for Affirmative Action, and San Francisco Latino Voter Registration Education Project (the "Organizations") filed this class action on behalf of naturalized citizens who use Spanish or Chinese language voting materials. Their complaint alleges that United States Attorney Russoniello, the nine County District Attorneys, the nine County Registrars of

**2.** No problems with Chinese voting materials were noted.

**3.** As a naturalized citizen Olagues is required to read, write, and speak English. Despite his English literacy he chose to use a bilingual ballot because he was running for an office and wanted to see how his campaign statement was translated in Spanish.

Lilia Medina, a naturalized citizen, was also investigated. When the INS could not verify her citizenship status, Russoniello requested the FBI to have her prove she was a United States citizen.

Another citizen who was investigated was Maria Gloria Rodriguez. A United States citizen since 1967, she worked with the League of Women Voters and was a deputy registrar of voters.

**4.** For example, March Fong Eu, Secretary of State for California, wrote to Russoniello expressing concern that the investigation might have a chilling effect on bilingual voters' right to vote and that to single out voters of Hispanic and Chinese heritage for this registration fraud investigation raised serious questions of law and policy.

Voters, and INS District Director David Ilchirt (collectively the "Government") violated their civil and constitutional rights under the Voting Rights Act, and the first, fifth, fourteenth, and fifteenth amendments to the United States Constitution.

The appellants first sought to enjoin the investigation. Their declarations filed with the district court not only indicated how the investigation would adversely affect Chinese-speaking and Spanish-speaking voters, but also disclosed that the registration rate had already declined markedly in what would ordinarily have been the most successful weeks of the voter registration drive. The district court dismissed the claim for injunctive relief, holding that it lacked subject matter jurisdiction. The appellants timely appealed.

On May 26, 1982, Russoniello again wrote to the district attorneys of the nine counties concerning the investigation. He asked them to interview 113 persons that the INS could not identify as citizens. The district attorneys complied with his request. The interviews were conducted in person and by mail. Individuals who did not have proof of citizenship were asked to disclose the name of the person or the organization who had registered them.

On September 24, 1982, the Government moved for summary judgment or, in the alternative, for dismissal of the appellants' complaint and on November 30, 1982, the appellants moved for partial summary judgment. The district court granted the Government's motion for summary judgment on the declaratory relief claims, and Olagues and the Organizations timely appealed.

This is a consolidated appeal from two district court decisions. The first appeal, No. 82–4427, is from the district court's decision on May 24, 1982, dismissing that part of plaintiffs' complaint seeking injunctive relief against federal defendants. The second appeal, No. 83–2581, is from the district court's judgment and final order on September 15, 1983, granting the Government's motion for summary judgment and denying the appellants' motion for partial summary judgment.

A divided panel of this court affirmed the district court. *Olagues v. Russoniello,* 770 F.2d 791, 806 (9th Cir.1985), *withdrawn for rehearing en banc,* Nos. 82–4427 & 83–2581, unpublished order (9th Cir. Jan. 21, 1986). We took this case *en banc* because it raises important voting rights and constitutional issues relating to foreign-born, recently registered voters who request bilingual ballots.

## DISCUSSION

### I. ARTICLE III JUSTICIABILITY

"Article III of the Constitution limits the power of federal courts to deciding 'cases' and 'controversies.'" *Diamond v. Charles,* —— U.S. ——, ——, 106 S.Ct. 1697, 1702, 90 L.Ed.2d 48 (1986). Before we can reach the merits of this appeal, there are two jurisdictional issues we must address. First, we must decide whether the case is moot because Russoniello has terminated the investigation. Then we must decide whether any of the appellants have standing to assert the claims at issue in this case.

#### A. *Mootness*

There is no question that a case or controversy remains with respect to the damage claim. However, because Russoniello terminated the investigation, we must determine whether there remains a live case or controversy with respect to the equitable relief claim.

■ By itself, past exposure to illegal conduct is insufficient to establish a present case or controversy necessary to support a claim for equitable relief. *O'Shea v. Littleton,* 414 U.S. 488, 495, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974). Claims for declaratory and injunctive relief therefore become moot when the challenged activity ceases if subsequent events show that the activity "could not reasonably be expected to recur," *Chinese for Affirmative Action v. Leguennec,* 580 F.2d 1006, 1009 (9th Cir.1978), *cert. denied,* 439

U.S. 1129, 99 S.Ct. 1047, 59 L.Ed.2d 90 (1979), unless there is a possibility of "continuing, present adverse effects," *O'Shea,* 414 U.S. at 496, 94 S.Ct. at 676; *see also City of Los Angeles v. Lyons,* 461 U.S. 95, 101, 103 S.Ct. 1660, 1664, 75 L.Ed.2d 675 (1983) (six-month moratorium does not make case moot because the moratorium is not permanent and intervening events have not irrevocably eradicated the effects of the alleged violation).

In the instant case, there is a possibility of continuing adverse effects. The Organizations argue that their efforts have been hobbled because of the fear engendered in Chinese-speaking and Spanish-speaking foreign-born citizens by the challenged investigation. The Organizations assert that the voter fraud investigation intimidated Chinese-speaking and Spanish-speaking citizens from registering to vote or requesting bilingual ballots because of fear that they would become targets of the investigation. These individuals are new to this country. Thus they are understandably insecure in exercising their recently acquired rights as citizens, and easily intimidated by government action.

■ The termination of Russoniello's investigation is not irrevocable. Therefore, unless we determine the legality of a voter fraud investigation that focuses on foreign-born voters requesting bilingual ballots, the Organizations' registration drives may continue to suffer from the chilling effects of the investigation despite its termination.

■ Moreover, a live case or controversy for purposes of Article III may also remain even after the challenged activity ceases if the Government's actions are capable of repetition, yet evading review. *See, e.g., Super Tire Engineering Co. v. McCorkle,* 416 U.S. 115, 122, 94 S.Ct. 1694, 1698, 40 L.Ed.2d 1 (1974); *Lee v. Schmidt-Wenzel,* 766 F.2d 1387, 1390 (9th Cir.1985). The capable-of-repetition doctrine is limited to extraordinary cases where: (1) the duration of the challenged action is too short to be fully litigated before it ceases; and (2)

there is a reasonable expectation that the plaintiffs will be subjected to the same action again. *Wiggins v. Rushen,* 760 F.2d 1009, 1011 (9th Cir.1985).

The first requirement is clearly met here. Voter registration investigations, such as the one conducted in the present case, may be of short duration, making them effectively capable of evading review by an appellate court. *See, e.g., Nebraska Press Association v. Stuart,* 427 U.S. 539, 546–47, 96 S.Ct. 2791, 2796–97, 49 L.Ed.2d 683 (1976).

To satisfy the second requirement, the plaintiff must make a reasonable showing that he will again be subject to the challenged activity. *E.g., Lyons,* 461 U.S. at 109, 103 S.Ct. at 1669; *United States v. Max,* 779 F.2d 1415, 1416 (9th Cir.1986) (per curiam). Russoniello did not voluntarily cease the challenged activity because he felt that the investigation was in any way improper. Rather, he terminated the investigation solely because it failed to produce evidence supporting any further investigative efforts. Russoniello has at all times maintained that his actions were proper. A government official's voluntary cessation of the challenged activity is insufficient to render a case moot if "the legality of the challenged practices" is still disputed because "[t]he [official] is free to return to his old ways." *W.T. Grant Co.,* 345 U.S. 629 at 632, 73 S.Ct. 894 at 897, 97 L.Ed. 1303; *see Allee v. Medrano,* 416 U.S. 802, 810–11, 94 S.Ct. 2191, 2197–98, 40 L.Ed.2d 566 (1974); *Walling v. Helmerich & Payne, Inc.,* 323 U.S. 37, 43, 65 S.Ct. 11, 14, 89 L.Ed. 29 (1944); *Pomerantz v. County of Los Angeles,* 674 F.2d 1288, 1291 (9th Cir.1982) (claim is moot if subsequent "events have completely and irrevocably eradicated the effects of the alleged violation").

■ Moreover, Russoniello continues to have available to him the necessary bilingual ballot lists to conduct a voter registration investigation similar to the one challenged here.[5] Because Russoniello is au-

---

5. The Government points out that the Director

of the Census now has determined that these

thorized to investigate election fraud and has the means to repeat a similar bilingual voter registration investigation, it is reasonable to believe that the appellants could be the targets of a similar investigation in the future. Thus, the same voting rights and constitutional issues are capable of repetition yet evading review.[6]

Furthermore, because this case raises important voting rights and constitutional issues, a strong public interest requires us to address the appropriateness of the Government's investigatory methods. The existence of a "public interest in having the legality of the practices settled ... militates against a mootness conclusion." *United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953).

In short, because there is a possibility of continuing adverse effects from the challenged governmental activities, and because the challenged activity is capable of repetition, yet evading review, and because of a strong public interest in having the

legality of the challenged procedure determined, we conclude that a live case or controversy remains for purposes of granting equitable relief.

## B. *Standing*

■ The Government contends that Olagues and the Organizations all lack standing to sue for equitable relief. "Standing is a threshold question in every case before a federal court." *McMichael v. County of Napa,* 709 F.2d 1268, 1269 (9th Cir.1983). A party seeking to invoke the court's authority must demonstrate that it personally has suffered some actual or threatened injury as a result of the alleged illegal conduct of the other party. *Diamond v. Charles,* —— U.S. at ——, 106 S.Ct. at 1702.

### 1. *Olagues*

■ In the circumstances of this case, Olagues would have standing to seek equitable relief under the Voting Rights Act if he has suffered an injury that has more than a generalized grievance.[7] *See Allen*

---

counties no longer must provide bilingual ballot materials, *see* 49 Fed.Reg. 25,887–88 (June 25, 1984). Nonetheless, the election officials in San Francisco, Santa Clara, Alameda and Monterey counties will continue to provide the same bilingual ballot materials as previously required by section 203(b) of the Voting Rights Act, 42 U.S.C. § 1973aa–1a(b). Therefore, the Government again will be able to target, for a voter registration fraud investigation, foreign-born Chinese-speaking and Spanish-speaking voters by obtaining the names of newly-registered citizens who request bilingual voting materials.

6. This case is distinguishable from *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), and *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). In *O'Shea,* the plaintiffs challenged certain arrest and bail procedures employed by state law enforcement and judicial officials. However, to be subject to these alleged unlawful procedures one must first have violated some law and then have been arrested. 414 U.S. at 496, 94 S.Ct. at 676. The Supreme Court found that the plaintiffs had failed to show any case or controversy because presumably they would obey the law, and therefore never would become subject to any unlawful procedures. *Id.* at 497, 94 S.Ct. at 676. Unlike the situation before us, the plaintiffs in *O'Shea* did not assert any constitutional right to act in the same manner as they had

acted before their arrest. *See id.* at 498, 94 S.Ct. at 677.

In *Lyons,* the plaintiff challenged the use of chokeholds by Los Angeles police on arrestees. The Court applied *O'Shea* and held that there was no case or controversy for equitable relief because whether Lyons would be arrested and subjected to a chokehold a second time was purely speculative. *See* 461 U.S. at 105–06, 103 S.Ct. at 1666–67.

Here, Olagues and the organizations assert that the Government's actions have interfered with constitutionally protected activities. Moreover, unlike the plaintiffs in *O'Shea* and *Lyons,* neither Olagues nor the Organizations need to break any law to be subjected to the challenged governmental conduct.

7. Whether a plaintiff has standing under Article III involves constitutional and prudential limitations. *McMichael,* 709 F.2d at 1269–70 (citing *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979)). The constitutional limitations involve three components: (1) a threatened or actual "distinct and palpable" injury to the plaintiff; (2) a "fairly traceable causal connection" between that injury and the challenged conduct of the defendant; and (3) a "substantial likelihood" that the relief requested will redress or prevent the injury. *McMichael,* 709 F.2d at 1270. The prudential limitations require the plaintiff to:

*v. State Board of Elections,* 393 U.S. 544, 554–57, 89 S.Ct. 817, 825–27, 22 L.Ed.2d 1 (1969). He has alleged an injury. His request for a bilingual ballot triggered an investigation of his INS records by the FBI and INS and an interview by the local District Attorney. Therefore, he was stigmatized as a person who might have registered to vote illegally. This, at a time when he was running for political office himself.

The Government contends that Olagues's alleged injuries are insufficient to warrant injunctive relief. The Government categorizes the chilling effect injury as "subjective" and thus not justiciable under *Laird v. Tatum,* 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972).

In *Laird,* plaintiffs sought injunctive and declaratory relief against the Army's domestic surveillance system. *Id.* 408 U.S. at 2–8, 92 S.Ct. at 2320–23. The plaintiffs, however, were not targets of the surveillance, thus any chilling effect resulted merely from their knowledge of the surveillance activities. In this case, Olagues was in fact a target of Russoniello's investigation. Thus, the chilling effect stems from more than mere knowledge of a general investigation. Moreover, the Court in *Laird* recognizes that a plaintiff has standing when the government improperly imposes an affirmative obligation on him. *Id.* at 12, 92 S.Ct. at 2325. In this case, because he requested a bilingual ballot, the Government required Olagues to prove his citizenship, an affirmative obligation the Government did not place on people who request English language ballots. Therefore, we hold that Olagues has standing to sue for equitable relief.

### 2. *The Organizations*

Chinese for Affirmative Action is a voluntary membership group that seeks to protect the rights of Chinese-Americans. It monitors compliance with bilingual elec-

(1) assert the individual plaintiff's own rights; (2) have an injury that is more than a generalized grievance; and (3) have an interest arguably within the zone of interests protected or

tion requirements and encourages Asian-Americans to register and to vote. The Hispanic Coalition for Human Rights is an association of Hispanic organizations and persons of Mexican descent, with a goal of securing the civil rights of Hispanics. It encourages Hispanic Americans to register and to vote, and advises them on the availability of bilingual election materials. The San Francisco Latino Voter Registration Education Project is a coalition of Hispanic groups that was conducting a voter education and registration drive at the time of the investigation.

An association-plaintiff has standing to seek redress of direct injury to the association itself. *See Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 40, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976); *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975); *NAACP v. Button,* 371 U.S. 415, 428, 83 S.Ct. 328, 335, 9 L.Ed.2d 405 (1963). Under certain circumstances, an association may also be entitled to seek redress for injury to its members. *See, e.g., Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); *Simon,* 426 U.S. at 40, 96 S.Ct. at 1925; *Warth,* 422 U.S. at 511, 95 S.Ct. at 2211; *Sierra Club v. Morton,* 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972).

In *Hunt,* the Supreme Court established a three-part test to determine whether an association has standing: (1) either the group or its members must have suffered some direct, cognizable injury; (2) the interests the group seeks to protect must be germane to the organization's purpose; and (3) the claim or relief sought must not require the participation of the individual members in the suit. 432 U.S. at 343, 97 S.Ct. at 2441. A mere "abstract concern," *Simon,* 426 U.S. at 40, 96 S.Ct. at 1925, or "special interest" in a public issue, *Sierra*

regulated by the statute or constitutional guarantee in question. *See id.* In this case, the only disputed factor is whether Olagues has an injury that is more than a generalized grievance.

*Club,* 405 U.S. at 739, 92 S.Ct. at 1368, is legally insufficient to confer standing.

First, the Organizations contend that they have been injured in two ways. The investigators questioned foreign voters requesting bilingual ballots concerning who had assisted them in registering. The Organizations assert that the investigation has discouraged its members from participating in their associational activities, because they now fear that participation in the program to register voters will make them targets of a criminal investigation. Therefore, the Organizations contend that the investigation cast a pall over their associational activities in violation of their first amendment rights. Moreover, while Russoniello stated that the federal government would not prosecute illegally registered voters, he raised the possibility that the state might prosecute them under state law. Thus, by discouraging their members from participating in the voter registration drives, and by discouraging citizens from registering to vote, the investigation directly undermined the Organizations' voter education and registration efforts.

The Organizations also assert that both they and their members are threatened with possible prosecution for violations of the Voting Rights Act. They contend that they are undoubtedly the targets of Russoniello's investigation and could be charged with improperly influencing ineligible persons to register.

■ We conclude that the Organizations' allegations raise sufficient claims of potential direct injury to both themselves and their members. In the case before us, the Organizations' voter education and registration efforts are unquestionably protected from unwarranted interference by prosecutorial officials; whether the investigation actually involved any unwarranted intrusions into their associational activities affects the merits of their claim, not their standing. Moreover, as stated above, members who participated in the Organizations' counseling activities and voter registration drives are potential targets of future prosecutions.

Second, we conclude that the interests the Organizations seek to protect are "germane" to their purposes. *See Hunt,* 432 U.S. at 343, 97 S.Ct. at 2441. The Organizations' activities are centered on voter education and registration. Such activities are directly related to the individual member's interests in counseling and registering voters free from unwarranted governmental intrusions.

Third, the relief sought by the Organizations does not require the participation of individual members in the suit. *See id.* The principal claims are for injunctive and declaratory relief; such equitable relief is particularly suited for group representation. *See Warth,* 422 U.S. at 515, 95 S.Ct. at 2213. Thus, we conclude that the Organizations have standing to sue for equitable relief.

## II. INJUNCTIVE RELIEF

■ The appellants sought to enjoin a preliminary investigation by a United States Attorney. The district court dismissed the appellants' complaint on the grounds that "as a matter of law" it lacked "jurisdiction to enjoin or otherwise control" such an investigation. We review this legal question *de novo. See United States v. Oregon,* 718 F.2d 299, 303 & n. 5 (9th Cir.1983). We conclude that the district court erred in ruling that it lacked jurisdiction. *See Jett v. Castaneda,* 578 F.2d 842, 845 (9th Cir.1978) (district court has jurisdiction to enjoin illegal conduct by a prosecutor). Therefore, the district court erred in dismissing the injunctive claims. We remand this issue to the district court to determine whether an injunction should issue.

## III. DECLARATORY RELIEF

The district court granted summary judgment for the Government on the appellants' claim for declaratory relief. We determine *de novo* whether, viewing the evidence in the light most favorable to the party against whom summary judgment has been granted, the moving party has

demonstrated that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Continental Casualty Co. v. City of Richmond,* 763 F.2d 1076, 1078–79 (9th Cir.1985); Fed. R.Civ.P. 56(c).[8]

### A. *Equal Protection Claims*

#### 1. *Level of Scrutiny*

The United States Attorney's investigation of voter fraud registration in the nine-county area targeted recently registered, foreign-born voters who requested bilingual ballots. The appellants contend that such a classification must be subjected to strict scrutiny under equal · protection clause analysis because it discriminates on the basis of language, race, and national origin.

The district court analyzed the case by defining the classification solely on the basis of language and held that the classification does not involve a suspect class. Accordingly, the district court refused to apply the strict scrutiny standard and held that there was no equal protection violation.

Stated simply, the challenged investigation targeted recently registered, foreign-born voters who requested bilingual ballots. Bilingual ballots are only available in Spanish and Chinese. Therefore, as a practical matter, the investigation targeted Spanish-speaking and Chinese-speaking immigrants.

The traditional indicia of a suspect classification are whether the class is "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 28, 93 S.Ct. 1278, 1293, 36 L.Ed.2d 16 (1973). Whether the classification is based on an immutable characteristic is sometimes an indication of a suspect class. *See Frontiero v. Richardson,* 411 U.S. 677, 686, 93 S.Ct. 1764, 1770, 36 L.Ed.2d 583 (1973). But immutability is not the sole determining factor. For example, the Supreme Court has held that aliens form a suspect class. *See Bernal v. Fainter,* 467 U.S. 216, 219, 104 S.Ct. 2312, 2316, 81 L.Ed.2d 175 (1984); *Graham v. Richardson,* 403 U.S. 365, 372, 91 S.Ct. 1848, 1852, 29 L.Ed.2d 534 (1971).

Congress has explicitly recognized that pervasive discrimination exists against linguistic minorities · by requiring state governments to provide bilingual ballots even though these voters must achieve a minimum level of fluency in English to obtain United States citizenship.

> The Congress finds that voting discrimination against citizens of language minorities is pervasive and national in scope.... [T]hey have been denied equal educational opportunities by State and local governments, resulting in severe disabilities and continuing illiteracy in the English language. The Congress further finds that, where State and local officials conduct elections only in English, language minority citizens are excluded from participating in the electoral process. In many areas of the country, this exclusion is aggravated by acts of physical, economic, and political intimidation.

42 U.S.C. § 1973b(f)(1).

Moreover, an individual's primary language skill generally flows from his or her national origin. *See Yu Cong Eng v. Trinidad,* 271 U.S. 500, 517, 46 S.Ct. 619, 623, 70 L.Ed. 1059 (1926); *Berke v. Ohio Department of Public Welfare,* 628 F.2d 980, 981 (6th Cir.1980) (per curiam); 29 C.F.R. § 1606.7(a). The target groups in this case are distinct and easily identifiable. Just as persons of different ethnic groups are dis-

---

**8.** The district court erroneously applied the good faith immunity standard of *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), to grant summary judgment on the entire case. Qualified immunity, however, is only a defense to damages and does not bar equitable relief. *Wood v. Strickland,* 420 U.S. 308, 314 n. 6, 95 S.Ct. 992, 997 n. 6, 43 L.Ed.2d 214 (1975).

tinguished by surnames, *Hernandez v. Texas,* 347 U.S. 475, 480 n. 12, 74 S.Ct. 667, 671 n. 12, 98 L.Ed. 866 (1954) (Spanish surnames reliably identify Hispanics, treated as a suspect class), persons of different nationalities are often distinguished by a foreign language. Here it is clear that the investigation targeted Chinese and Hispanic immigrants. The courts have long recognized the history of discriminatory treatment inflicted on Chinese and Hispanic people. *See, e.g., Hernandez v. Texas,* 347 U.S. at 475, 74 S.Ct. at 667; *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

In contending that a language-based classification is not the equivalent of a national origin classification, and thus does not denote a suspect class, the Government relies on *Soberal-Perez v. Heckler,* 717 F.2d 36, 41 (2d Cir.1983) (English-only Social Security notices do not violate Spanish-speaking claimants' equal protection rights), *cert. denied,* 466 U.S. 929, 104 S.Ct. 1713, 80 L.Ed.2d 186 (1984); *Frontera v. Sindell,* 522 F.2d 1215, 1219–20 (6th Cir. 1975) (English-only Civil Service exams do not violate Hispanic individuals' equal protection rights); *Garcia v. Gloor,* 618 F.2d 264, 271 (5th Cir.1980) (employer's English-only rule did not violate Title VII or section 1981), *cert. denied,* 449 U.S. 1113, 101 S.Ct. 923, 66 L.Ed.2d 842 (1981); and *Guadalupe Organization, Inc. v. Tempe Elementary School District No. 3,* 587 F.2d 1022, 1027 (9th Cir.1978) (no right to bilingual education).

These cases are readily distinguishable from the instant case. They all involve a general classification of English-speaking versus non-English-speaking individuals. *See, e.g., Soberal-Perez,* 717 F.2d at 41. The instant case as a practical matter, however, involves a specific classification of Spanish-speaking and Chinese-speaking immigrants. Thus, while a non-English-speaking classification is facially neutral with respect to ethnic group classification, the classification challenged here is not, because for all practical purposes it is a classification based on race and national origin.

■ Therefore, we hold that the three characteristics, i.e., foreign-born voter, recently registered voter, and bilingual ballot voter, taken together in the instant case form a class that has the traditional indicia of a suspect classification based on race and national origin. Accordingly, the district court erred in not applying the strict scrutiny standard to the equal protection issue raised in this case.

### 2. Analysis

■ We have concluded that the voter registration fraud investigation directed toward foreign-born, recently registered voters, requesting bilingual ballots involves a suspect classification. To survive an equal protection challenge under the strict scrutiny standard, a suspect classification must be necessary to serve a compelling governmental interest, and the governmental conduct must employ the least drastic means to achieve that compelling interest. *Illinois State Board of Elections v. Socialist Workers Party,* 440 U.S. 173, 184–85, 99 S.Ct. 983, 990–91, 59 L.Ed.2d 230 (1979). Appellants concede that the government has a compelling interest in preventing voter registration fraud. *See Dunn v. Blumstein,* 405 U.S. 330, 345, 92 S.Ct. 995, 1004, 31 L.Ed.2d 274 (1972).

Because it failed to apply strict scrutiny analysis, the district court must determine on remand whether the classification used by the government is "necessary" to prevent voter registration fraud, and whether the investigation conducted was the least drastic means of achieving that governmental interest.

### B. Substantive Due Process

■ Voting is a fundamental right. *E.g., Dunn,* 405 U.S. at 336, 92 S.Ct. at 999. Classifications that burden the right to vote can be upheld only if they are necessary to advance a compelling governmental interest. *Id.* Moreover, the classification must be closely tailored to effectuate only that interest. *Zablocki v. Red-*

**1522**

*hail,* 434 U.S. 374, 388, 98 S.Ct. 673, 682, 54 L.Ed.2d 618 (1978).

■ The appellants argue that the voter registration investigation had the practical effect of intimidating foreign-born citizens from registering to vote and from requesting bilingual voting materials. The appellants also contend that the number of new registrants in the final weeks decreased even though normally that is the most successful period for voter registration drives. Thus, there is a material issue of fact as to whether the classifications burdened the appellants' right to vote, and the district court erred in granting the government's summary judgment motion on the substantive due process issue.

### C. *Voting Rights Act*

■ The district court dismissed the Voting Rights Act claim against Russoniello, Ilchirt, and the county officials on the basis that the Act does not expressly provide for a right of action against federal officials. However, as discussed below, we find that the appellants have failed to establish a Voting Rights Act violation. To establish a Voting Act violation, unlike a constitutional violation of a citizen's right to vote, the plaintiff must show an intent to deny or abridge the right to vote. Thus, we need not decide whether a claim for relief against federal officials may be asserted under the Voting Rights Act or whether the county officials would be protected as Russoniello's agents.[9]

The appellants contend that Russoniello and the county defendants violated 42 U.S.C. § 1973b(f)(2), which reads:

No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision *to deny or abridge* the right of any citizen of the United States to vote *because* he is a member of a language minority group. (Emphasis added.)

■ The county officials applied a procedure to Spanish-speaking and Chinese-speaking voters that they did not apply to other voters. Voters requesting bilingual ballots were asked as part of the investigation to prove their citizenship and were questioned in some instances by the FBI. There is, however, no evidence that by investigating the individual appellants, the Government intended to deny or abridge their right to vote.[10]

Apparently, the appellants contend that the Government also violated 42 U.S.C. §§ 1971(b) and 1973i(b). Under these sections no person may intimidate, or attempt to intimidate any person from voting or from aiding someone to vote. In the instant case, there is evidence that the investigation did intimidate the appellants. However, that is insufficient. The appellants failed to raise a material issue of fact as to whether the government officials did in fact *intend* to intimidate them. *See United States v. McLeod,* 385 F.2d 734, 740–41 (5th Cir.1967).

Nor is there a claim under 42 U.S.C. § 1973aa–1a. The appellants failed to set forth a factual basis for their allegation that the county officials failed to provide bilingual ballots in compliance with that section.

Therefore, there is no material issue of fact or law, and the district court did not err in granting summary judgment on the Voting Rights Act claims.

---

9. The appellants also ask for statutory damages under the Voting Rights Act. Private litigants have an action against state officials for declaratory and injunctive relief under 42 U.S.C. § 1973c. *Allen v. State Board of Elections,* 393 U.S. 544, 555, 89 S.Ct. 817, 826, 22 L.Ed.2d 1 (1969). The Act, however, does not specify any statutory damage remedies for private plaintiffs. Because the appellants have failed to establish that a Voting Rights Act violation exists, we need not decide this issue.

10. The county officials also contend that their participation in the investigation is too attenuated to constitute a violation of 42 U.S.C. § 1973b(f)(2). They argue that their only role was to disclose public records, and that their participation did not interfere with anyone's right to vote. Because there is no Voting Rights Act violation, we need not reach this issue.

## D. The First Amendment

The appellants contend that the district court erred in dismissing their first amendment claim. They allege that the investigation directly interfered with their constitutional right of association and political expression.[11]

The record provides support for the appellants' assertions that the voter registration fraud investigation discouraged the Organizations' members from participating in associational activities. Some members asserted that participation dropped off because the investigation: (1) discredited the Organizations' activities in their communities; (2) caused members to lose confidence in the democratic process; and (3) targeted members for a prosecutorial investigation. The government did not refute any of these assertions.

Therefore, viewing the evidence in the light most favorable to the appellants, there is a material issue of fact as to the extent of the burden on the appellants' first amendment rights. Thus, the district court erred in finding as a matter of law that the Government's interest in preventing voter fraud outweighed the appellants' first amendment interests. We also remand this issue to the district court.

## IV. DAMAGE CLAIMS

The appellants' complaint may be read to include a request for damages based on constitutional or statutory claims such as section 1983, 42 U.S.C. § 1983. We agree with the district court that the government officials involved in this action would be entitled to immunity from such damage claims.

State prosecutors are absolutely immune from damage suits with respect to their quasi-judicial activities. *Imbler v. Pachtman*, 424 U.S. 409, 430–31, 96 S.Ct. 984, 994–95, 47 L.Ed.2d 128 (1976). Federal prosecutors are also absolutely immune with respect to their quasi-judicial activities, *Butz v. Economou*, 438 U.S. 478, 516–17, 98 S.Ct. 2894, 2915–16, 57 L.Ed.2d 895 (1978); however, they receive only good faith immunity for prosecutorial activities that are merely administrative or investigative, *Jacobson v. Rose*, 592 F.2d 515, 524 (9th Cir.1978), *cert. denied*, 442 U.S. 930, 99 S.Ct. 2861, 61 L.Ed.2d 298 (1979). Other executive officials are entitled to qualified immunity, *see e.g., Scheuer v. Rhodes*, 416 U.S. 232, 247–48, 94 S.Ct. 1683, 1691–92, 40 L.Ed.2d 90 (1974) (state executive officials).

We need not determine whether the district court erred in denying absolute immunity, because we agree that as a matter of law all those sued are entitled at least to qualified, good faith immunity. The controlling standard is "the objective reasonableness of an official's conduct, as measured by reference to *clearly established* law." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (emphasis added).

Under this objective standard, all the government officials are entitled to immunity. In the instant case, all of the appellants' claims under the Voting Rights Act and the first, fifth, fourteenth, and fifteenth amendments to the Constitution raise issues of first impression. Therefore, the government officials did not violate "clearly established" rights.

11. The district court found that: (1) the minimal intrusion imposed by defendants' conduct was clearly outweighed by the government's interest in preventing voter fraud; and (2) to the extent that plaintiffs allege defendants' actions "chilled" their first amendment rights merely by conducting the investigation, the complaint must be dismissed for failure to state a claim, *Laird v. Tatum*, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972).

A dismissal under *Laird* would not be a dismissal for failure to state a claim, but a dismis-

sal for lack of jurisdiction. In *Laird,* the parties challenging the Army's surveillance operations were not, themselves, targets of the surveillance. The Court held that, in this context, allegations of a subjective "chill," without more, were not sufficient to confer standing. 408 U.S. at 13–14, 92 S.Ct. at 2325–26.

*Laird* is factually distinguishable from this case, where the parties challenging the investigation are *targets* of the investigation. Here, the appellants clearly have standing to assert their first amendment rights.

## V. ATTORNEY'S FEES

The appellants seek costs and attorney's fees for the appeal pursuant to the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, and the Equal Access to Justice Act, 28 U.S.C. § 2412. We grant costs pursuant to 28 U.S.C. § 2412(a) because the appellants have prevailed in part on appeal. *Cf. Thomas v. SS Santa Mercedes*, 572 F.2d 1331, 1335 (9th Cir. 1978). We deny the appellants' request for attorney's fees on appeal, however, because the appellants did not prevail on their section 1983 claim, *see* 42 U.S.C. § 1988, and because we are unable to say that the government's position on appeal was not substantially justified, *see* 42 U.S.C. § 2412(d). The appeal raised issues of first impression. *See Foster v. Tourtellotte*, 704 F.2d 1109, 1113 (9th Cir.1983).

AFFIRMED in part and REVERSED in part and REMANDED for further proceedings in light of this opinion.

WALLACE, Circuit Judge, with whom SNEED, ALARCON, and BEEZER, Circuit Judges, join, dissenting:

I dissent from the majority's opinion in this case and adhere to the analysis originally stated in the withdrawn panel opinion, *Olagues v. Russoniello*, 770 F.2d 791 (9th Cir.1985) (*Olagues I*), *withdrawn for rehearing en banc*, Nos. 82–4427, 83–2581 (9th Cir. Jan. 21, 1986). Although I agree with part of the majority opinion, I believe the majority's reasoning is deficient in several respects. I do not agree with the majority's conclusion that Olagues has standing to seek injunctive relief absent a substantial possibility that he will be subjected to a future investigation of voting abuses. In addition, I see no reason to remand this case since the district court would lack the power to grant injunctive relief. Finally, I believe that the majority is wrong in requiring that the language-based classifications challenged here be subject to strict scrutiny.

### I

In its description of the facts in this case, the majority omits crucial information regarding the genesis and scope of Russoniello's investigation. *See Olagues I*, 770 F.2d at 794. The United States Attorney had received information from the Santa Clara County district attorney which indicated that a substantial number of recently registered foreign-born voters were noncitizens who had been registered illegally. The information was based on a study of recent registrants whose primary language skill was not English. Many of the noncitizen registrants apparently believed, or were told, that they were entitled to register and vote on the basis of long periods of residence in this country or of marriage to United States citizens.

The United States Attorney was justifiably concerned that the right of citizens to vote was being diluted by wholesale registration of noncitizens. He therefore launched a carefully-crafted investigation to determine whether there existed in Santa Clara County, and surrounding counties, any organized effort to register noncitizens to vote. Such a conspiracy would be punishable under federal law. *See* 42 U.S.C. § 1973dd–3(c). He sought a random sampling of names from voter registration lists of recently registered foreign-born voters who had requested bilingual ballots in each of these counties. Based on information the United States Attorney had received, this group was most likely to yield individuals who had been illegally registered. Noncitizens are more likely to request bilingual ballots, if only because knowledge of English is generally *required* before a foreign-born individual may become a naturalized citizen. *See* 8 U.S.C. § 1423(1). Bilingual ballots were provided in Spanish and Chinese in the relevant counties because of large Hispanic and Chinese communities. Voter registration drives had recently been conducted in those communities, and possibly were connected to the registration of large numbers of noncitizens.

After obtaining names of foreign-born voters who had requested bilingual ballots, the United States Attorney further refined the scope of his inquiry by asking the Im-

migration and Naturalization Service (INS) to verify the citizenship of the registrants. Only when the INS was unable to identify many of these persons as citizens did county district attorneys conduct interviews with possible noncitizen voters, at the request of the United States Attorney. The purpose of these interviews of registrants, as stated by the United States Attorney to the county district attorneys, was "to determine (1) the basis upon which they claim citizenship and entitlement to vote and (2) in cases in which they are unable to prove citizenship, what representations were made to them by Registrars as to their qualification to vote." Federal prosecution of registrants was neither contemplated nor threatened; the investigation was instead conducted with the intent of identifying and possibly prosecuting any persons who conspired to register them illegally. No one was prosecuted on the basis of information obtained in the voluntary interviews, and the investigation was terminated.

## II

I agree with the majority that this case is not moot, and that the organizations have standing sufficient to afford jurisdiction over this case. The majority's analysis adds little to what was stated in *Olagues I. Compare* maj. op. at 1515–17, 1518–19 *with Olagues I,* 770 F.2d at 794–96, 797–99. What it does add may muddy analysis of these issues. For example, it is unclear how the United States Attorney "raised the possibility that the state might prosecute [noncitizen registrants] under state law," maj. op. at 1519, in a way that could add to the organizations' standing. The federal and state governments are independent sovereigns, and the United States Attorney has no power to initiate prosecutions under state law. The record clearly indicates that Russoniello was not concerned with and did not encourage any prosecutions under state law.

## III

I do not agree that Olagues has standing to seek equitable relief in this case. No doubt, Olagues has standing to seek damages if his rights were violated by the government's investigations. However, the majority fails to recognize that with respect to equitable relief, Olagues's position is fundamentally different from that of the organizations. "[U]nlike Olagues, members who participated in the organizations' counseling activities and voter registration drives are potential targets of future prosecutions." *Olagues I,* 770 F.2d at 799.

The majority writes that "equitable relief is particularly suited for group representation." Maj. op. at 1519; *see Olagues I,* 770 F.2d at 799. On the facts of this case, I agree that the prosecutorial investigation was sufficiently "targeted" at the organizations to give them "case or controversy" standing. *See id.* at 798. I agree with the majority that the threat of another investigation, possibly followed by criminal prosecutions, may engender fear in its members "that participation in the program to register voters will make them targets of a criminal investigation," and that this in turn may hinder the organizations' protected activities. *See* maj. op. at 1518–1519. The point is that the organizations and their members "are threatened with possible prosecution for violations of the Voting Rights Act." Maj. op. at 1519. Olagues is not similarly threatened.

The majority's observation that Olagues differs from the plaintiffs in *Laird v. United States,* 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972) (*Laird*), because those plaintiffs "were not targets of" governmental investigation, maj. op. at 1518, adds little. It demonstrates only that this case is distinguishable from *Laird* because Olagues suffered a past injury. I agree that alleged past injury gives Olagues, unlike the plaintiffs in *Laird,* standing *to seek damages.* The majority errs by somehow extending this standing to seek relief for past injury into standing to seek relief for prospective injury. It is quite clear that such standing to seek damages is insufficient to afford standing for prospective re-

lief. *See City of Los Angeles v. Lyons,* 461 U.S. 95, 103, 105–06, 109, 103 S.Ct. 1660, 1666–67, 1669, 75 L.Ed.2d 675 (1983) (*Lyons*).

Olagues has never been threatened with prosecution by federal authorities. Instead, "he seeks to enjoin prosecutorial activities which are focused on persons other than himself." *Olagues I,* 770 F.2d at 797. Although he was investigated because the government had reason to believe that Olagues was a noncitizen who had been illegally registered to vote, the result of the investigation was to demonstrate that Olagues is a citizen, legally registered to vote. There is little reason to believe that the government will again investigate Olagues as a possible noncitizen voter. The majority does not explain how Olagues has made "a reasonable showing that he will again be subject to the challenged activity." Maj. op. at 1516. In fact, it appears highly unlikely that, even in the event of a similar future investigation, Olagues's name would again be drawn in a small random sample of *recently registered* bilingual voters from his county, or that he would again be mistaken for a noncitizen.

Even given the very remote possibility that the government might again investigate Olagues, the investigation in this case involved purely voluntary, noncoercive interviews—with no threat of federal prosecution. At best, Olagues, as a legally registered voter, can allege a de minimis "chilling effect" on his right to vote. It is difficult to understand how Olagues was "stigmatized" by the investigation, since it was not publicized, or how the majority finds it relevant that Olagues "was running for political office himself." Maj. op. at 1518. Olagues simply does not have standing to seek prospective relief.

## IV

The majority also neglects to respect the special limitations on our power to enjoin criminal investigations by the executive branch of our government. *See Olagues I,* 770 F.2d at 799–801. "[A] court may not exercise its 'supervisory power' in a way which encroaches on the prerogatives of [a prosecutor] unless there is a clear basis in fact and law for doing so." *United States v. Chanen,* 549 F.2d 1306, 1313 (9th Cir.), *cert. denied,* 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 83 (1977).

Without doubt, district courts may, under appropriate circumstances, have power to enjoin illegal prosecutorial actions. We recognized the possible existence of such power in *Jett v. Castaneda,* 578 F.2d 842, 845 (9th Cir.1978) (*Jett*), and, indeed, the majority relies on *Jett.* Maj. op. at 1519. What the majority fails to recognize are the strict limitations we placed in *Jett* on the judiciary's power to enjoin prosecutorial investigations. In *Jett,* we held that federal courts may not supervise the executive's "preliminary conduct" in criminal prosecutions. *Jett,* 578 F.2d at 845. This conclusion was based on our concern for the constitutional separation of powers. *See id.* It was not premised on the desirability or legality of prosecutorial actions in any given case. We recognized that the separation of powers principle may not mandate judicial inaction in a case where the executive outrageously oversteps the limitations on prosecutorial power. Thus, we stated that a prosecutor "may be subject to a suit to enjoin *egregiously illegal* conduct." *Id.* (emphasis added).

Other courts have similarly recognized that "[o]nly the most extraordinary circumstances warrant anticipatory judicial involvement in criminal investigations." *Reporters Committee for Freedom of the Press v. American Telephone & Telegraph,* 593 F.2d 1030, 1065 (D.C.Cir. 1978) (*Reporters Committee*), *cert. denied,* 440 U.S. 949, 99 S.Ct. 1431, 59 L.Ed.2d 639 (1979); *see also LaRouche v. Webster,* 566 F.Supp. 415, 417 (S.D.N.Y. 1983) (*LaRouche*) ("party seeking to enjoin a criminal investigation bears an almost insurmountable burden"); *see generally Olagues I,* 770 F.2d at 799–801. In the context of a good faith criminal investigation, the plaintiffs should be required to show "a *clear and imminent* threat of such future [prosecutorial] misconduct."

*Reporters Committee,* 593 F.2d at 1071 (emphasis in original).

The majority acknowledges that the criminal investigation in this case was undertaken in good faith. *See* maj. op. at 1523 (based on the good faith standard, all individual defendants are entitled to immunity). There is nothing egregious about the prosecutorial conduct in this case. Nor is there any *imminent* likelihood that the investigation will be repeated. Because there are no extraordinary circumstances that outweigh general concerns regarding the separation of powers, I can only conclude that a federal court is powerless to award relief.

*Jett*'s requirements for equitable relief against a prosecutorial investigation cannot be met on the facts alleged in this case. *Cf. Lyons,* 461 U.S. at 103, 105–06, 103 S.Ct. at 1666–67; *O'Shea v. Littleton,* 414 U.S. 488, 499–502, 94 S.Ct. 669, 677–79, 38 L.Ed.2d 674 (1974). If the district court applies the law of our circuit, it can only deny the plaintiff's claims for equitable relief. *See Jett,* 578 F.2d at 845. Thus, I see no reason for a remand.

## V

I also dissent from the majority's conclusion that the language-based classifications used by Russoniello in this case must be subjected to strict scrutiny. Even if they are, the need for prosecutorial consideration of such factors is sufficiently compelling to survive the test.

### A.

The majority attempts to distinguish several cases on the ground that "[t]hey all involve a general classification of English-speaking versus non-English-speaking individuals," while this case "as a practical matter ... involves a specific classification of Spanish-speaking and Chinese-speaking immigrants." Maj. op. at 1521, *purporting to distinguish Soberal-Perez v. Heckler,* 717 F.2d 36, 41 (2d Cir.1983) (*Soberal-Perez*), *cert. denied,* 466 U.S. 929, 104 S.Ct. 1713, 80 L.Ed.2d 186 (1984); *Frontera v. Sindell,* 522 F.2d 1215, 1219–20 (6th Cir.

1975); *Garcia v. Gloor,* 618 F.2d 264, 268 (5th Cir.1980) (*Garcia*), *cert. denied,* 449 U.S. 1113, 101 S.Ct. 923, 66 L.Ed.2d 842 (1981); *Guadalupe Organization, Inc. v. Tempe Elementary School District No. 3,* 587 F.2d 1022, 1027 (9th Cir.1978).

I find the majority's ground for distinction of these cases "as a practical matter" to be extraordinarily vague. *Garcia,* for example, involved "a rule prohibiting employees from speaking Spanish on the job," which rule affected only those employees who were Hispanic. 618 F.2d at 266–67. Nevertheless, the court held that discrimination with respect to language was *not* equivalent to discrimination because of national origin. *Id.* at 268. It is not clear what "practical" distinction the majority intends to draw.

More importantly, I think that the foundation of the majority's purported distinction is conceptually flawed. Why, if a classification based upon English-speaking versus non-English-speaking persons implicates no suspect classification, does a classification between Spanish-speaking and non-Spanish-speaking persons raise special constitutional problems? The majority answers that "a non-English-speaking classification is facially neutral with respect to ethnic group classification." Maj. op. at 1521. Somehow, discrimination against speakers of minority languages is suspect, *unless* that discrimination is instituted across-the-board, against *all* minority languages, and in favor of the majority of English speakers *alone.* I suggest that this makes little sense. Either language is suspect, or it is not. Clearly it is not. *See Olagues I,* 770 F.2d at 801–02 (discussing Supreme Court precedent).

### B.

Ultimately, the majority fails to hold that language-based classifications must be subjected to strict scrutiny. Instead, it holds that "the three characteristics, i.e., foreign born voter, recently registered voter, and bilingual ballot voter, taken together in the instant case form a class that has the tradi-

tional indicia of a suspect classification based on race and national origin." Maj. op. at 1521. This is a surprising conclusion.

If language by itself does not define a suspect classification, it is difficult to understand why the other factors considered by Russoniello—which narrowed his investigation—require strict scrutiny. The other two factors reflect the United States Attorney's efforts to narrow his inquiries to those persons who may have knowledge of serious criminal activity. It is the height of irony to hold, as the majority now implicitly does, that Russoniello's actions are suspect precisely because they are narrowly tailored to his purpose of uncovering crime. Certainly, he committed no invidious discrimination by focusing on foreign birth. With scant exceptions, anyone born in this country is a citizen. U.S. Const. amend. XIV, § 1; *United States v. Wong Kim Ark,* 169 U.S. 649, 682, 18 S.Ct. 456, 469, 42 L.Ed. 890 (1898) (excepting "children born of alien enemies in hostile occupation, and children of diplomatic representatives of a foreign State"). The criminal activity he sought to root out was illegal registration of *non*citizens. Russoniello could not enforce the law against registration of noncitizens without considering the factor of foreign birth. Similarly, the factor of recent registration does not define or even suggest any invidious discrimination against a suspect class. It simply focused Russoniello's investigation on persons who had registered at a time that illegal registrations may have been rampant and who, if they were witnesses to criminal activity, would be more likely to recollect details than would be long-registered noncitizen voters. No doubt, the United States Attorney will be puzzled that his efforts to narrow carefully the scope of his investigation are precisely the basis of the court's conclusion that his investigation is suspect and must be subjected to strict judicial scrutiny. The majority's opinion suggests that, on the other hand, had he been sloppy in defining the scope of his work and less concerned with the consequences of an over-broad investigation, the majority would perhaps review his actions more leniently.

## C.

The majority applies strict scrutiny on the ground that the United States Attorney's language classifications *in practice* discriminated on the basis of race and national origin. Maj. op. at 1521. I instead agree with the Second Circuit that strict scrutiny of language classifications is warranted only when a plaintiff has shown an intent to discriminate on the basis of a suspect class. *See Soberal-Perez,* 717 F.2d at 42. To establish intentional discrimination, a plaintiff must demonstrate that "the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of' not merely 'in spite of' its adverse effects upon an identifiable group." *Id., quoting Personnel Administrator v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979). A gulf separates our case from cases such as *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), in which a facially neutral statute was administered "with an evil eye and an unequal hand" to discriminate against a minority on the basis of race or national origin. The majority fails to bridge that gulf.

To the extent that the language classifications enabled the United States Attorney to reach persons of Chinese or Hispanic ancestry, it is apparent that recently-registered voters from the Chinese-American and Hispanic-American communities were most likely to be able to furnish him with valuable information for the criminal investigation of a pattern of illegal voter registration he had reason to believe was occurring in those communities. We have no reason to believe that his decision to interview these persons was motivated by anything other than a desire to investigate potentially serious criminal activity, and indeed the majority concedes that the investigation was conceived and conducted in good faith. Maj. op. at 1523. No discriminatory intent can be inferred.

Finally, I observe that considerations of national origin or race are relevant in many prosecutorial investigations conducted by the executive branch. *See, e.g., United States v. Brignoni-Ponce,* 422 U.S. 873, 886–87, 95 S.Ct. 2574, 2582–83, 45 L.Ed.2d 607 (1975) (Mexican appearance may be considered in decision to stop automobile to question occupants regarding immigration violations). Under the majority's analysis, if officers had reason to believe that a murder had been committed in the Chinese-American community by a Chinese-American, their decision to interview Chinese-Americans in hopes of obtaining leads would be subjected to exacting scrutiny. I cannot agree that such choices are properly subject to heightened scrutiny. Nor can I agree that they would fail to pass muster if they were. Some degree of common sense must animate our constitutional interpretations. Such investigatory decisions are indeed necessary to serve the compelling interest of fighting crime in an efficient and effective manner.

## VI

Olagues and the organizations also argue that the United States Attorney unconstitutionally burdened their right to vote and their first amendment rights. I reject their arguments on the grounds stated in *Olagues I. See* 770 F.2d at 802. It is difficult to see how any "burden" was placed on anyone's right to vote since no individual citizen was denied his right to vote. Russoniello's preliminary inquiry was aimed at ferreting out potential voting fraud, in order to enhance the right to vote of those who qualified. Individual citizens who were initially identified as not qualified were thereafter only the subject of narrowly confined, noncoercive follow-up interviews probing potentially unlawful activities of others. Even if we construe this as a "burden," it is a burden that all citizens must be asked to bear when they are potential witnesses to unlawful conduct.

Similarly, the incidental burden (if any) that may have been placed on first amendment associational rights must give way to the government's need to ensure the sanctity of the polls. Investigative activity inherently "affects or 'implicates' First Amendment activity." *Reporters Committee,* 593 F.2d at 1059 (emphasis omitted). The review of public records cannot involve any violation of first amendment rights. Moreover, the follow-up questioning of potential witnesses also is lawful. *See, e.g., Jones v. Unknown Agents of the Federal Election Commission,* 613 F.2d 864, 877–78 (D.C.Cir.1979) (upholding questioning of campaign contributors regarding illegal contributions), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1019, 62 L.Ed.2d 755 (1980); *LaRouche,* 566 F.Supp. at 418 ("As long as reasonable cause to investigate exists, the mere asking of material questions does not constitute a First Amendment violation.").

For all of the above reasons, I would affirm the judgment of the district court.

HUG, Circuit Judge, dissenting:

I dissent from the majority opinion because I conclude the case is moot. The majority opinion acknowledges in Section IV that the appellants cannot, as a matter of law, establish a claim for damages because the government officials are entitled to immunity. Thus, the only possible viable claim is for injunctive or declaratory relief.

As the majority opinion properly notes, claims for declaratory or injunctive relief become moot when the challenged activity ceases, unless one of the limited exceptions identified in the majority opinion comes into play. I find insufficient grounds to invoke an exception.

The investigation was brought about by allegations of particular voter fraud; these were investigated and the matter was dropped, with no charges filed or further investigation sought. There is no threat of continued investigation nor any contention that there is any suspected voter fraud that would again lead to such an investigation. I conclude that there is insufficient indication that there again would be the allegations of voter fraud sufficient to bring about a similar investigation, that the in-

vestigation would be pursued in the same fashion, or that the county officials would participate in the same way in such an investigation. Nor do I discern any substantial continuing effects from the past investigation sufficient to sustain a finding of a live controversy. Therefore, I conclude that the claims for injunctive and declaratory relief are moot under the authority of *Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) and *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). I would affirm the summary judgment on the claims for damages and remand the claims for injunctive and declaratory relief to be vacated as moot.

SNEED, Circuit Judge, concurring in Circuit Judge Wallace's dissent:

I concur in Judge Wallace's dissent. I write only to underscore Judge Wallace's dissent.

The United States Attorney focused upon (1) recently registered, (2) foreign born voters, (3) who requested bilingual ballots. Only Spanish and Chinese bilingual ballots existed. The purpose was to determine if any such persons were not United States citizens. Non-citizens were not entitled to vote.

The heart of the majority opinion appears in the following lines:

"The instant case as a practical matter, however, involves a specific classification of Spanish-speaking and Chinese immigrants. Thus, while a non-English-speaking classification is facially neutral with respect to ethnic group classification, the classification challenged here is not, because for all practical purposes it is a classification based on race and national origin." Maj. Opinion, *ante,* p. 1521.

No further explanation is offered. The United States Attorney's target was non-citizens attempting to vote. That is not a suspect class. True, his investigation was aimed at a possibly large pool of offenders. That Hispanics and Chinese make up that pool is the consequence of geography, his-

tory, and the Voting Rights Act, not the discriminatory bias that the majority ascribes to the fact. One does not have to hold a doctorate in history to know that voting by non-citizens has occurred in our nation's history from time-to-time. Had the plaintiffs' alleged that the United States Attorney commenced his investigation to abridge the right of Chinese and Hispanic citizen to vote, an action under the Voting Rights Act would have been alleged. The majority correctly holds no such claim was alleged.

The classification employed by the United States Attorney was crafted to discover fraudulent voting. It was "for all practical purposes" nothing more.