The ALASKA FISH AND WILDLIFE FEDERATION AND OUTDOOR COUNCIL, INC., and the Alaska Fish and Wildlife Conservation Fund, Inc., Plaintiffs-Appellants,

v.

Frank L. DUNKLE, Director, United States Fish and Wildlife Service, and Donald Collinsworth, Commissioner of the Alaska Department of Fish and Game, Defendants-Appellees,

The Alaska Federation of Natives, the Association of Village Council Presidents and Tony Vaska, Intervenors-Appellees.

No. 86-3657.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 7, 1986.

Decided Oct. 9, 1987.

Gregory F. Cook, Douglas, Alaska, for plaintiffs-appellants.

James C. Kilbourne, Edward J. Shawaker, and J. Carol Williams, Washington, D.C., for Director, U.S. Fish and Wildlife Service, David A. Gayer, Washington, D.C., of counsel. Larri Irene Spengler, Juneau, Alaska, for appellee State of Alaska.

Donald C. Mitchell, Anchorage, Alaska, for intervenors-appellees.

Before SKOPIL and FLETCHER, Circuit Judges, and VUKASIN,[*] District Judge.

SKOPIL, Circuit Judge:

The Alaska Fish and Wildlife Conservation Fund and the Alaska Fish and Wildlife Federation and Outdoor Council ("the Conservation Fund"), appeal the district court's dismissal of its claims against defendants, Frank L. Dunkle, Director of the United States Fish and Wildlife Service ("Fish and Wildlife Service"), and Donald Collinsworth, Commissioner of the Alaska Department of Fish and Game ("ADF & G"). The Conservation Fund also appeals the district court's grant of summary judgment in favor of intervenors, the Alaska Federation of Natives, the Association of Village Council Presidents, and Alaska State Representative Tony Vaska ("Intervenors"), on their cross claims against the defendants.

The Conservation Fund seeks a declaration that two cooperative agreements (the "Hooper Bay Agreement" and the "1985 Goose Management Plan") entered into by

---

[*] Honorable John P. Vukasin, Jr., United States District Judge, Northern District of California, sitting by designation.

the Fish & Wildlife Service, the ADF & G, the Association of Village Council Presidents, and the California Department of Fish and Game are void. They contend that the Fish & Wildlife Service failed to follow federal procedures before entering into the agreement and that the Hooper Bay Agreement and the 1985 Goose Management Plan illegally permitted closed season hunting by Alaskan Natives. As applied to subsistence hunting of migratory birds in Alaska, the district court determined that the 1925 Alaska Game Law ("1925 AGL"), 43 Stat. 739, superseded the 1918 Migratory Bird Treaty Act ("MBTA"), 40 Stat. 755 (codified at 16 U.S.C. §§ 703–711 (1982)). It held that a provision in the 1925 AGL preventing the Department of Agriculture from placing restrictions on subsistence hunting continues in force today. For this reason, the district court concluded that the Fish and Wildlife Service has no authority to place restrictions on subsistence hunting by Alaskan Natives.

We first consider the procedural claims raised by the Fish and Wildlife Service and ADF & G. We conclude that the Conservation Fund has standing to pursue its claims and that a decision in favor of the Conservation Fund would not infringe on the prosecutorial discretion of the Fish and Wildlife Service. We also conclude that this action is not moot.

We reverse the district court's decision as to the applicability of the 1925 AGL to the hunting of migratory game birds in Alaska. We hold that the MBTA governs the hunting of migratory birds and that the MBTA currently does not permit closed season subsistence hunting of migratory game birds by Alaskan Natives. We remand to the district court to determine whether the Hooper Bay Agreement and the 1985 Goose Management Plan violate the provisions of the MBTA.[1]

## FACTS AND PROCEEDINGS BELOW

This case concerns the hunting of migratory birds on the Yukon-Kuskokwim Delta ("Delta"). In early March, migratory birds, including Cackling Canada Geese, White Fronted Geese, Pacific Black Brant, and Emperor Geese, arrive on the Delta. During the spring and summer months the birds nest and raise their young. In early September the birds migrate south.

The birds represent an important part of the traditional Native diet. Upon arrival in the spring, the migratory birds provide Delta Natives with the first available fresh meat after the long winter.

Hunting by Delta Natives, along with hunting by sportsmen, loss of habitat, and natural predation, has resulted in a decline in the migratory bird population. This decline has concerned conservationists since the turn of the century and has become increasingly severe. All parties agree that extraordinary measures are necessary to reverse the current trend.

The Fish and Wildlife Service has assumed that all harvesting of migratory birds between March 10 and September 1 of each year is prohibited by the MBTA. In recent years, however, the Fish and Wildlife Service has not made an effort in Alaska to ensure compliance with the MBTA. Political and geographical considerations have led the Service to conclude that traditional methods of enforcing game laws are not effective in the vast reaches of rural Alaska. In 1975 the Service adopted a written policy stating that subsistence hunting in Alaska during the closed season would not be punished.

In an effort to decrease sport and subsistence hunting during the closed season,

---

1. We do not resolve whether the government's failure to comply with the notice and comment provisions of the Administrative Procedure Act or the National Environmental Policy Act invalidates the Hooper Bay Agreement or the 1985 Goose Management Plan. Those issues must first be resolved by the district court.

Nor is it necessary for us to determine whether the Alaska National Interest Lands Conservation Act ("ANILCA"), 16 U.S.C. § 668dd, provides an independent basis for restricting subsistence hunting. Having determined that the MBTA requires the government to comply with its international treaty obligations, we do not need to consider whether ANILCA also places this obligation on the government in its operation of the Yukon Delta National Wildlife Refuge.

the Fish and Wildlife Service initiated negotiations with Alaskan Natives. In January 1984 the Fish and Wildlife Service, the ADF & G, the Association of Village Council Presidents, and the California Department of Fish and Game agreed to a cooperative plan to reduce the hunting of three types of migratory birds. This plan, known as the Hooper Bay Agreement, prohibited sport hunting of Cackling Canadian Geese and reduced the hunting of White Fronted Geese and Black Brants during the 1985 hunting season. The Agreement placed restrictions on subsistence hunting, but did not prohibit this activity. Enforcement of the Hooper Bay Agreement was to be accomplished jointly by the various governmental agencies and local village councils. During 1984 the parties complied with the terms of the Agreement. In 1985 the Hooper Bay Agreement was replaced by a similar agreement, the 1985 Goose Management Plan.

Shortly before the 1984 nesting season began, the Conservation Fund filed legal action against the Fish and Wildlife Service and the ADF & G. The Conservation Fund alleged that by entering into the Hooper Bay Agreement, the Fish and Wildlife Service illegally permitted Alaskan Natives to engage in closed season hunting. It contended that this action violated the MBTA, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–559 (1982), and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4347 (1982). The Conservation Fund sought an injunction to prohibit the Fish and Wildlife Service from acquiescing in the taking of migratory birds during the 1984 closed hunting season. It also requested declaratory relief to require the Fish and Wildlife Service to comply with APA and NEPA before entering into further agreements and to develop a comprehensive plan for reducing the harvest of the endangered species.

Shortly thereafter, the Intervenors filed a cross-claim against the Fish and Wildlife Service. The cross-claim alleged, in relevant part, that the 1925 AGL rather than the MBTA governs the subsistence hunting of migratory game birds in Alaska. The Intervenors argued that the 1925 AGL su-

perceded the MBTA and that until the Secretary of the Interior adopts regulations pursuant to the 1978 Fish and Wildlife Improvement Act ("Fish and Wildlife Improvement Act"), 16 U.S.C. § 712 (1982), Congress has, pursuant to the 1925 AGL, authorized Alaskan Natives to harvest migratory waterfowl during all seasons of the year if they or members of their family are in need of food and other sufficient food is not available.

The district court denied the Conservation Fund's request for a preliminary injunction for the 1984 season. All parties then filed motions for summary judgment. In the spring of 1985 the district court stayed the case through the 1985 nesting season. The district court ordered the Fish and Wildlife Service and the Intervenors to report to the court regarding the effectiveness of the 1985 Goose Management Plan. The reports were received, and in January 1986 the court granted summary judgment in favor of the Intervenors.

The court ruled that the Fish and Wildlife Service may not restrict subsistence hunting activities by Alaskan Natives. It concluded that the 1925 AGL repealed the MBTA insofar as the MBTA applied to Alaska. It held, however, that all of the MBTA's terms except for its restriction on subsistence hunting were incorporated into the 1925 AGL. Because the 1925 AGL permitted subsistence hunting by Alaskan Natives and no subsequent legislation modified the subsistence hunting provision in the 1925 AGL, the district court held that the Hooper Bay Agreement and the 1985 Goose Management Plan had no legal effect. The court declined to address whether the Secretary has authority under the Fish and Wildlife Improvement Act to restrict subsistence hunting because the Fish and Wildlife Service has not yet issued regulations pursuant to that Act. The district court concluded that the Conservation Fund's APA and NEPA claims were moot because the two agreements had no legal effect.

The Conservation Fund argues that the district court incorrectly found that the 1925 AGL superceded the MBTA with re-

spect to subsistence hunting of migratory birds in Alaska. It seeks a declaratory ruling that the Hooper Bay Agreement and the 1985 Goose Management Plan are contrary to the MBTA because they permit subsistence hunting. The Conservation Fund also seeks to compel the Fish and Wildlife Service to adopt measures restricting subsistence hunting. Although the Fish and Wildlife Service and ADF & G argued below that the 1925 AGL does not supersede the MBTA, they have not appealed the district court's decision. They argue instead that the Conservation Fund does not have standing to challenge the participation of the Fish and Wildlife Service in cooperative agreements concerning subsistence hunting of migratory birds. In the alternative, they argue the action should be dismissed because the Conservation Fund seeks to infringe on the prosecutorial discretion of the Fish and Wildlife Service.

## DISCUSSION

### I.

A. *Standing.*

The Fish and Wildlife Service and ADF & G argue that the Conservation Fund's claims should be dismissed for lack of standing. Although argued, the issue of standing was not addressed in the district court's decision. Standing is a threshhold question in every case. *Olagues v. Russoniello,* 797 F.2d 1511, 1517 (9th Cir.1986) (en banc), *cert. granted,* —— U.S. ——, 107 S.Ct. 1885, 95 L.Ed.2d 493 (1987).

■ The test for standing is not precise. *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Nevertheless, we have some guidance. A plaintiff's claim must include three allegations: (1) a personal injury, (2) which is fairly traceable to the defendant's allegedly unlawful conduct, and (3) which is likely to be redressed by the requested relief. *Id.*

■ Courts have found personal injury in a variety of settings in which recreational or aesthetic uses of natural resources are at stake. Non-economic criteria are as valid a measure of personal injury as eco-nomic criteria. *See United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 686, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973); *Sierra Club v. Morton,* 405 U.S. 727, 734, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972); *Port of Astoria v. Hodel,* 595 F.2d 467, 476 (9th Cir.1979); *Trustees for Alaska v. Watt,* 524 F.Supp. 1303, 1307 (D. Alaska 1981), *aff'd,* 690 F.2d 1279 (9th Cir.1982). A plaintiff must allege use of the resources in a way that will be significantly affected by the proposed actions. *See Sierra Club,* 405 U.S. at 735, 92 S.Ct. at 1366. In this case the Conservation Fund alleged a personal injury to its members. The decrease in the number of certain species of migratory birds has harmed the environment. The harm has injured those who wish to hunt, photograph, observe, or carry out scientific studies on the migratory birds. These injuries can be measured in both economic and non-economic terms.

The Conservation Fund has also shown that the injury of which it complains is traceable to the actions of the defendants and that there is a substantial likelihood that declaratory relief would redress the injury. The requirement of a causal link and redressability are closely related. *See Railway Labor Executives Ass'n v. Dole,* 760 F.2d 1021, 1023 (9th Cir.1985); *see also Duke Power Co. v. Carolina Envtl. Study Group,* 438 U.S. 59, 72–78, 98 S.Ct. 2620, 2629–33, 57 L.Ed.2d 595 (1978). If, as alleged by the Conservation Fund, the Hooper Bay Agreement and the 1985 Goose Management Plan permit illegal subsistence hunting, the injury is traceable to the actions of the government. The parties do not dispute the district court's finding that subsistence hunting is one cause of the decline in the migratory bird population. There is a substantial likelihood that declaratory relief in the form of a declaration that close-season subsistence hunting violates federal law will redress the injury.

The Conservation Fund is also a proper representative of those who are injured. An association may enjoy standing on behalf of its members if: " '(a) it members would otherwise have standing in their own right; (b) the interests it seeks to protect

are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of the individual members in the lawsuit.'" *International Union, Auto. Aerospace & Agricultural Implement Workers v. Brock,* 477 U.S. 274, 106 S.Ct. 2523, 2529, 91 L.Ed.2d 228 (1986) (quoting *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977)). All three prongs of the test are satisfied. First, the Conservation Fund's members use the resources in question and have been injured by the decrease in the migratory bird population. Second, preventing the extinction of migratory gamebirds is germane to the association's purpose of participating in "litigation in the courts when necessary to protect the beneficial pursuits of hunting ... and scientific wildlife management practices." Third, because the Fund seeks declaratory and prospective relief rather than money damages, its members need not participate directly in the litigation. *See Olagues,* 797 F.2d at 1519.

The Conservation Fund has adequately established that it is a proper representative of the injured and that the injury suffered is traceable to the defendants. The relief requested, although not a complete solution, would help to prevent the current decline in the migratory bird population. Appellants have standing to pursue their claim.

### B. *Discretion to Prosecute.*

■ The Fish and Wildlife Service and the ADF & G argue that the Conservation Fund's claims should be dismissed because any result in favor of the Fund would infringe on the enforcement and prosecutorial discretion of the Service. Failure of an agency to prosecute is presumptively not reviewable under the APA. *See Heckler v. Chaney,* 470 U.S. 821, 831, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985); *see also Railway Labor Executives Ass'n,* 760 F.2d at 1024–25. In *Chaney,* the Supreme Court held that the presumption of reviewability normally accorded to agency actions does not apply to an agency's decision not to prosecute or enforce a law. *Chaney,* 470

U.S. at 831–32, 105 S.Ct. at 1655–56. A decision not to enforce a law is generally committed to an agency's absolute discretion. *Id.* An agency's failure to act is reviewable "where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *Id.* at 833, 105 S.Ct. at 1656 (footnote omitted).

The Conservation Fund contends that the Fish and Wildlife Service has abrogated its statutory duty to enforce the closed hunting season required by the MBTA. To the extent that the Service's failure to act is the basis of the Conservation Fund's claim, we lack jurisdiction under the APA to consider the claim. The MBTA explicitly delegates the authority to adopt regulations and discretionary enforcement powers to the Secretary of the Interior. *See* 16 U.S.C. §§ 704, 712. The discretion granted to the Fish and Wildlife Service precludes our review of the Service's failure to enforce the MBTA.

■ The Conservation Fund does not, however, rely solely on the Fish and Wildlife Service's failure to enforce the MBTA as the basis for its claim. It also complains that by entering into the Hooper Bay Agreement and the 1985 Goose Management Plan the Fish & Wildlife Service violated the MBTA. Such actions are reviewable, *see Chaney,* 470 U.S. at 831, 105 S.Ct. at 1655; *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971), unless the agency action is committed to agency discretion by law. 5 U.S.C. § 701(a)(2). The MBTA grants the Secretary of the Interior discretion to regulate the taking of migratory birds, but that discretion is limited to actions in accordance with the treaties the MBTA implements. *See* 16 U.S.C. 712(1). We have jurisdiction to determine whether the agency action, entry into the Hooper Bay Agreement and the 1985 Goose Management Plan, was contrary to the provisions of the treaties and thus to the MBTA.

### C. *Mootness.*

The Hooper Bay Agreement was signed in 1984 and governed the 1985 hunting sea-

son. The 1985 Goose Management Plan replaced the Hooper Bay Agreement and remained in force until the end of 1986. We have not been informed whether any agreement was entered into for the 1987 season but do not believe this to be a relevant factor. The 1985 district court decision that the Fish & Wildlife Service had no authority to restrict subsistence hunting by Alaskan Natives would have made any cooperative agreement unenforceable.[2]

"Judicial review of administrative action ... is limited by the requirement that there be an actual, live controversy to adjudicate." *Campesinos Unidos, Inc. v. United States Dep't of Labor,* 803 F.2d 1063, 1067 (9th Cir.1986) (citing *Iron Arrow Honor Soc'y v. Heckler,* 464 U.S. 67, 72–73, 104 S.Ct. 373, 375–76, 78 L.Ed.2d 58 (1983)). We recognize an exception to the mootness doctrine if the government's actions are capable of repetition but will evade review. *See, e.g., Olagues,* 797 F.2d at 1516. The doctrine is limited to extraordinary cases in which: "(1) the duration of the challenged action is too short to be fully litigated before it ceases; and (2) there is a reasonable expectation that the plaintiffs will be subjected to the same action again." *Id.* Moreover, "[t]he existence of a 'public interest in having the legality of the practices settled ... militates against a mootness conclusion.'" *Id.* at 1517 (quoting *United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953)).

 This action is one of those extraordinary cases in which the complained of activity may be repeated and yet evade review. First, the cooperative agreements challenged in this action were of only one year's duration. It is difficult to obtain judicial review during the duration of a one-year agreement. Second, we find that the Conservation Fund has met its burden of showing a sufficient likelihood that there will continue to be injurious actions relating to the official sanctioning of

closed-season hunting. *See Olagues,* 797 F.2d at 1516 (holding that "voluntary cessation of the challenged activity is insufficient to render a case moot if the legality of the challenged practices' is still disputed because '[t]he [official] is free to return to his old ways'" (quoting *W.T. Grant Co.,* 345 U.S. at 362, 73 S.Ct. at 897)). *See generally, Sample v. Johnson,* 771 F.2d 1335, 1340–43 (9th Cir.1985) (discussing injury requirement), *cert. denied,* 475 U.S. 1019, 106 S.Ct. 1206, 89 L.Ed.2d 319 (1986). In addition, questions concerning the authority of the Fish and Wildlife Service to regulate the subsistence hunting of migratory birds are likely to recur each year if not settled by this court. *See United States v. Oregon,* 769 F.2d 1410, 1414 (9th Cir.1985) (and cases cited therein) (dispute concerning fishing regulations adopted annually not moot). Finally, the public interest in having this dispute resolved is strong. The parties are unsure which laws govern the subsistence hunting of migratory game birds in Alaska. Unless the law is clarified it may not be possible to develop a program that addresses the population decline of migratory birds.

## II.

The Fish and Wildlife Service has assumed that the hunting of migratory birds in Alaska is governed by the MBTA and its implementing regulations. *See* 16 U.S.C. §§ 701–712; 50 C.F.R. §§ 20.1–20.155 (1987). Neither the MBTA nor the implementing regulations permit subsistence hunting of migratory game birds by Alaskan Natives during the closed season. The district court concluded, however, that a provision in the 1925 AGL which prohibited the adoption of regulations restricting subsistence hunting unless the hunted species was in danger of extinction remains in force today. Despite a convincing argument that the 1925 AGL was repealed when Alaska became a state, the district

---

**2.** ADF & G argues that the issuance by the Fish and Wildlife Service of a notice of its intent to propose regulations for subsistence harvesting of migratory birds pursuant to the 1978 Fish and Wildlife Improvement Act indicates that the issues involved in the case will soon be moot. *See* 51 Fed.Reg. 18,349–50 (1986); 51 Fed.Reg. 26,029 (1986). The Fish and Wildlife Service has not issued the expected regulations. We therefore decline to reach this issue.

court held that the subsistence hunting provision continues in force today.

### A. *Standard of Review*

A grant of summary judgment is reviewed de novo. *Alaska v. Lyng*, 797 F.2d 1479, 1481 (9th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1603, 94 L.Ed.2d 789 (1987). We must determine, viewing the evidence in the light most favorable to the non-moving party, whether there are any issues of material fact and whether the district court correctly applied the relevant substantive law. *Ashton v. Cory*, 780 F.2d 816, 818 (9th Cir.1986). The construction of a statute is a question of law reviewable de novo. *Lyng*, 797 F.2d at 1481.

### B. *The 1918 Migratory Bird Treaty Act*

The MBTA was enacted in 1918 to implement a convention between the United States and Great Britain protecting migratory birds. *See* Convention for the Protection of Migratory Birds, August 16, 1916, United States-Great Britain (on behalf of Canada), 39 Stat. 1702, T.S. No. 628 [hereinafter United States-Canada Convention]. By enacting the MBTA, Congress obtained regulatory authority over migratory birds which previously had been held by the individual states. *See Missouri v. Holland*, 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920). The MBTA has since been amended to implement conventions which the United States has signed with Mexico, Japan, and the Soviet Union. *See* Convention for the Protection of Migratory Birds and Game Mammals, February 7, 1936, United States-Mexico, 50 Stat. 1311, T.S. No. 912; Convention for the Protection of Migratory Birds and Birds In Danger of Extinction and Their Environment, March 4, 1972, United States-Japan, 25 U.S.T. 3329, T.I.A.S. No. 7990; Convention Concerning the Conservation of Migratory Birds and Their Environment, November 19, 1976, United States-USSR, 29 U.S.T. 4647, T.I.A.S. No. 9073.

The MBTA makes all hunting of migratory birds unlawful unless the hunting is authorized by regulations adopted pursuant to the MBTA. 16 U.S.C. § 703. The statute authorizes the Secretary of the Interior to adopt regulations governing the hunting of migratory birds. 16 U.S.C. § 704. The Secretary is granted broad discretion in determining the content of the regulations, but is subject to the provisions and the purposes of the conventions. *Id.* The Department of the Interior is also granted enforcement powers. 16 U.S.C. § 706.

The MBTA was amended in 1978 by the Fish and Wildlife Improvement Act to implement the United States-USSR Convention. The amendment added for the first time a statutory reference to subsistence hunting by Alaskan Natives.[3] The amendment allows the Secretary of the Interior to adopt regulations permitting subsistence hunting by Alaskan Natives if the regulations are in accordance with the provisions of the four treaties. 16 U.S.C. § 712.

Although the parties dispute whether the Fish and Wildlife Improvement Act requires the Secretary's regulations to be in accord with only the United States-USSR Convention or whether the regulations must be in accordance with all four treaties, the legislative history regarding the Fish and Wildlife Improvement Act makes clear that regulations permitting closed season subsistence hunting may not be adopted if they are contrary to any of the treaties. *See* S.Rep. No. 1175, 95th Cong., 2d Sess., *reprinted in* 1978 U.S.Code Cong. & Admin. News 7641 [hereinafter *Hearings*]. The legislative history shows, first, that Congress is in favor of permitting some subsistence hunting by Alaskan resi-

---

**3.** The relevant provision provides:

(1) In accordance with the various migratory bird treaties and conventions with Canada, Japan, Mexico, and the USSR, the Secretary of the Interior is authorized to issue such regulations as may be necessary to assure that the taking of migratory birds and the collection of their eggs, by the indigenous inhab-

itants of the State of Alaska, shall be permitted for their own nutritional and other essential needs, as determined by the Secretary of the Interior, during seasons established so as to provide for the preservation and maintenance of stocks of migratory birds.

16 U.S.C. § 712(1).

dents. The Senate Report states that "the subsistence provisions of the three earlier treaties lack the administrative flexibility necessary to deal with the issue in a responsible manner. In contrast to these earlier inadequacies, the USSR convention contains the most modern and workable language on subsistence and avoids the errors of the past." *Hearings* at 7645. Second, the legislative history shows that Congress believed amendment of the treaties with Canada, Mexico, and Japan was necessary before regulations permitting subsistence hunting could be adopted. Senator Gravel, speaking in favor of the Fish and Wildlife Improvement Act before the Senate, stated that *"as soon as* these other treaties can be amended by our negotiators and ratified, we can at least put to rest one of the most longstanding, volatile issues facing rural Alaskan users of migratory birds." 124 Cong.Rec. 31,532 (1978) (emphasis added). Third, the statutory amendment was enacted in anticipation of treaty modifications that the executive was then seeking to negotiate. *See Hearings* at 7645. Congress wanted to avoid the necessity of amending the MBTA each time a treaty was amended. *Id.*

■ The treaties with Canada, Mexico, and Japan have not been modified.[4] Thus, the Secretary of the Interior is authorized to issue regulations permitting subsistence hunting, but only to the extent that the regulations are in accord with all four treaties.

Subsistence hunting is regulated differently by each convention. The four treaties use different means to designate which birds are protected by the particular treaty, but all treaties protect the migratory birds covered by the Hooper Bay Agreement and the 1985 Goose Management Plan. *See* United States-Canada Convention, art. I; United States-Mexico Convention, art. IV; United States-Japan Convention, Annex 38, 39, 41; United States-USSR, Appendix. *See also* 50 C.F.R. § 10.13 (1986). The United States-Canada Convention requires a closed season between March 10 and September 1 of each year and limits the open season to three and one-half months. *See* United States-Canada Convention, art. II(1). It contains exceptions for Indians and Eskimos, but these exceptions do not apply to the hunting of the birds named in the Hooper Bay Agreement or the 1985 Goose Management Plan. *Id.* at art. II(3). The United States-Mexico Convention does not set dates for a closed season, but states that the open season may not exceed four months each year. *See* United States-Mexico Convention, art. II(A), (C). The United States-Mexico Convention does not mention subsistence hunting by Alaskan Natives. The United States-Japan Convention does not require a specific closed season. Instead, it provides that each country shall set its hunting season "so as to avoid [the birds'] principal nesting seasons and to maintain their populations in optimum numbers." *See* United States-Japan Convention, art. III(2). A subsistence hunting provision is specifically included, but its application is restricted to "Eskimos, Indians and indigenous peoples of the Pacific Islands" if the taking is for their own food and clothing. United States-Japan Convention, *Id.* at art. III(1)(e). The United States-Soviet Union Convention explicitly provides for subsistence hunting by Alaskan Natives. *See* United States-Soviet Convention, art. II(1)(c). It permits the Secretary to set a specific hunting season for subsistence hunting by Alaskan Natives. *Id.* at Art. II(2). This season must provide for the preservation and maintenance of stocks of migratory birds. United States-Soviet Convention, *Id.*

■ The United States-Canada Convention is the most restrictive of the four treaties, and all of the Secretary's regulations must be in accord with that treaty. Therefore the Secretary may adopt regulations that permit subsistence hunting for up to three and one-half months between September 1 and March 10 of each year.

---

**4.** A protocol modifying the United States-Canada Convention was signed but never ratified by the Senate. *See* Protocol Amending the 1916 Convention with Canada for the Protection of Migratory Birds (January 30, 1979), S.Doc. Executive W, 96th Cong., 2d Sess. (1980).

Closed season subsistence hunting by Alaskan Natives is not permitted by the MBTA.

## C. The 1925 Alaska Game Law

The district court held, however, that closed season subsistence hunting by Alaskan Natives is not regulated by the MBTA, but instead by the 1925 Alaska Game Law. It concluded that the 1925 AGL superceded the MBTA with respect to the hunting of migratory birds in Alaska and that the 1925 AGL prohibits the Secretary from adopting regulations restricting closed season subsistence hunting by Alaskan Natives. The district court held that this prohibition remains in force today.

The district court held that the 1925 AGL repealed the MBTA both by its plain language and by implication. The 1925 AGL regulated the hunting of various types of animals and birds in Alaska, including migratory game birds. 1925 AGL § 8. The Law created an Alaska Game Commission and delegated to the Commission substantial enforcement authority over hunting in Alaska. 1925 AGL §§ 4, 5. The Law provided that, unless permitted by it or regulations made pursuant to the 1925 AGL, it was unlawful to hunt migratory birds. 1925 AGL § 8. The Secretary of Agriculture was granted the authority to issue regulations permitting the hunting of game birds. 1925 AGL § 10.

The 1925 AGL was ambiguous as to its relationship with the MBTA. In section 10 it explicitly prohibited the Secretary from adopting regulations contravening the MBTA.[5] Section 16 of the 1925 AGL, however, could be read as an implicit repeal of the MBTA as it applied to Alaska. Section 16 stated that preexisting legislation relating to the protection of birds in Alaska would only remain in force until ninety days after regulations had been issued pursuant to the 1925 AGL.[6] The 1925 AGL also contained a provision in section 10 that prevented the Secretary from issuing regulations that prohibited Eskimos and Indians from taking birds during the closed season when other food was not available unless the Secretary determined that the particular species was in danger of extermination.

The district court began its analysis by holding that the two clauses in section 10 conflict. One clause proscribed restrictions on emergency subsistence hunting. The other clause prohibited regulations conflicting with the MBTA. Because the MBTA prohibited all hunting of migratory game birds between March 10 and September 1 of each year and the 1925 AGL permitted emergency subsistence during the entire year, the district court found that the clauses conflicted. The district court resolved the conflict by concluding that the 1925 AGL superceded the MBTA with respect to the regulation of migratory bird hunting in Alaska. It found that the 1925 AGL was intended to "comprehensively regulate all game and bird hunting in Alaska and replace the MBTA as a source of authority for issuing regulations in Alaska." The court relied on section 8 of the 1925 AGL which stated that all taking of game animals and birds was illegal unless permitted by this Act or by regulations made pursuant to this Act.[7] From this

5. The relevant section reads in part:

nor, except as herein provided, shall [any regulation] prohibit any Indian or Eskimo, prospector, or traveler to take animals or birds during the close season when he is in absolute need of food and other food is not available, ... but the Secretary by regulation may prohibit such native Indians or Eskimos, prospectors, or travelers from taking any species of animals or birds for food during the close season in any section of the Territory within which he shall determine that the supply of such species of animals or birds is in danger of extermination; nor shall any such regulation contravene any of the provisions of the migratory bird treaty Act and regulations. 1925 AGL § 10.

6. Section 16 states:

[t]hat the provisions of existing laws relating to the protection of ... birds, and nests and eggs of birds in the Territory shall remain in full force and effect until the expiration of ninety days from the date of the publication of regulations of the Secretary of Agriculture adopted pursuant to the provisions of this Act. 1925 AGL § 16.

7. Section 8 provides in relevant part:

[t]hat, unless and except as permitted by this Act or by regulations made pursuant to this Act, it shall be unlawful for any person to take, possess, sell, offer to sell, purchase or offer to purchase any game animal, land fur-

statement the district court concluded that the general repealing clause in section 16 expressly repealed the MBTA insofar as the MBTA applied to Alaska. The district court attempted to harmonize section 16 with section 10's provision that the MBTA was not to be contravened. It held that the MBTA was incorporated by reference into the 1925 AGL and that the MBTA still applied to Alaska to the extent that it was not inconsistent with the 1925 AGL. In the alternative, the district court found that the 1925 AGL repealed the MBTA's applicability to Alaska by implication. It relied on the principle that ambiguities in statutes intended to benefit natives must be resolved in favor of natives and the principle that a specific locally oriented clause such as the emergency taking clause is presumed to control over a more general statute such as the MBTA.

When interpreting a statute, "we look first to the statutory language and then to the legislative history if the statutory language is unclear." *Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984). It is a rule of statutory construction that "one provision should not be interpreted in a way which is internally contradictory or that renders other provisions of the same statute inconsistent or meaningless." *Shields v. United States,* 698 F.2d 987, 989 (9th Cir.), *cert. denied,* 464 U.S. 816, 104 S.Ct. 73, 78 L.Ed.2d 86 (1983). "[W]e must examine the language of the statute and the particular concerns which motivated Congress to pass it." *Hopi Tribe v. Watt,* 719 F.2d 314, 317 (9th Cir.1983).

It is possible to interpret the two clauses in section 10 so that they do not conflict and so that both provisions serve a purpose. The subsistence hunting provision fairly can be read to permit subsistence hunting of all animals and all birds which are not migratory. Emergency subsistence hunting of migratory birds would then be permissible insofar as it is permitted by the MBTA. Because the MBTA allows subsist-

ence hunting of some migratory nongame birds, both clauses would be given effect.

The legislative history of the 1925 AGL does not clarify the relationship between these two clauses. *See* H.R.Rep. No. 993, 68th Cong., 1st Sess. (1924); S.Rep. No. 480, 68th Cong., 1st Sess. (1924). The legislative reports do not refer to subsistence hunting by Alaskan Natives or to the MBTA. The reports do, however, delineate the policies which Congress intended to promote by adopting the 1925 AGL. Among those policies were flexibility in meeting local needs and conservation of the natural resources of the area. *See, e.g.,* S.Rep. No. 480 at 4. These policies support an interpretation of the emergency hunting provision that recognizes the emergency subsistence needs of Alaskan Natives but which also restricts the subsistence hunting of migratory birds.

If the two clauses of section 10 are not in conflict, the district court's conclusion that section 16 repealed all prior legislation specifically addressed to the Territory of Alaska but not legislation protecting animals nationwide, is called into doubt. We must ascertain and give effect to the plain meaning of the statute. *See Kidd v. United States Dep't of Interior,* 756 F.2d 1410, 1412 (9th Cir.1985). Because the statute specifically stated that the provisions of the MBTA were not to be contravened, the plain language of the statute suggests that section 16 did not repeal the MBTA insofar as it applied to Alaska.

The interpretation of the statute by the Secretary is also ambiguous, but it provides some guidance in determining Congress' intent when it adopted the 1925 AGL. We give great deference to the interpretation given a statute by the agency charged with its administration. *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). Although it is unclear how the agency initially interpreted the 1925 AGL, the agency's longstanding interpretation has been that Congress did not intend to permit subsistence hunting of

---

bearing animal, wild bird, or any parts thereof, or any nest or egg of any such bird,....

1925 AGL § 8.

migratory game birds or to have the 1925 AGL supercede the MBTA.

We are particularly deferential to the contemporaneous interpretation given to a statute by those responsible for its implementation. *See Watt v. Alaska*, 451 U.S. 259, 272–73, 101 S.Ct. 1673, 1680–81, 68 L.Ed.2d 80 (1981); *Udall*, 380 U.S. at 16, 85 S.Ct. at 801 (quoting *International Union of Elec., Radio & Machine Workers*, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961)). Four months after the 1925 AGL was passed, the Bureau of Biological Survey issued regulations implementing the 1925 AGL. *See* U.S. Dept. of Agriculture, Bureau of Biological Survey, Alaska Game Law and Regulations and Federal Laws Relating to Game and Birds in the Territory, issued May 1925. These initial regulations do not conclusively establish whether the agency believed emergency subsistence hunting was permissible or whether the 1925 AGL superceded the MBTA in Alaska. Regulation 8 permitted the taking of animals and birds by Indians and Eskimos who had not severed tribal relations if they were in absolute need of food.[8] This regulation contained no limitations as to the time of year when subsistence hunting could take place or as to which birds could be hunted. The regulations also contained an introductory statement which stated that the 1925 AGL did not supersede the MBTA.[9] While it is unclear what authority this introductory statement was intended to carry, its inclusion with the regulations shows an agency

intent that the MBTA continue in effect. Thus, the initial regulations show an intent to permit emergency subsistence hunting but to also follow the restrictive provisions of the MBTA.

The regulations issued pursuant to the MBTA in 1926, shortly after the 1925 AGL was enacted, continued to regulate the hunting of migratory birds in Alaska and to permit subsistence hunting of the migratory nongame birds as required by the United States-Canada Convention. *See* Presidential Proclamation of June 22, 1925, 44 Stat. 2579–81, *amending* Presidential Proclamation of July 31 1918, 40 Stat. 1812–18. The MBTA regulations were not altered in any way to account for passage of the 1925 AGL. *See Id.*

Subsequent administrative interpretation supports the view that the 1925 AGL did not supercede the MBTA and that the emergency hunting provision in the 1925 AGL did not govern the hunting of migratory game birds. First, regulations issued after 1926 under the MBTA have continued without exception to govern the hunting of migratory birds in Alaska. *See, e.g.*, 50 C.F.R. § 20.102 (1986). The only subsistence hunting exceptions in the MBTA regulations are those authorized by the four treaties. *See id.* § 20.132.

Second, the Secretary of the Interior modified regulation 8 in 1944 to make clear that the regulation did not permit the taking of migratory game birds in contravention of the MBTA.[10] The revised regula-

---

**8.** Regulation 8. Taking of Game by Prospectors, Travelers, and Certain Indians when in Need of Food

An Indian, Eskimo, or half-breed who has not severed his tribal relations by adopting a civilized mode of living or by exercising the right of franchise and an explorer, prospector, or traveler may take animals or birds in any part of the Territory at any time for food when in absolute need of food and other food is not available, but he shall not ship or sell any animal or bird or part thereof so taken.
U.S. Dept. of Agriculture, Bureau of Biological Survey, Alaska Game Law and Regulations and Federal Laws Relating to Game and Birds in the Territory, Issued May 1925.

**9.** The regulations stated:
The Alaska game law (act of January 1925) and the regulations thereunder supersede all

previous Federal laws and regulations for the protection of game animals, land fur-bearing animals, and birds in the Territory, *except the migratory-bird treaty act of July 3, 1918 (40 Stat. 755)*, the Lacey Act of May 25, 1900, as amended (31 Stat. 18–88; 35 Stat. 1137), and the law protecting animals and birds on Federal refuges (42 Stat. 98), and the regulations thereunder.
U.S. Dept. of Agriculture, Bureau of Biological Survey, Alaska Game Law and Regulations and Federal Laws Relating to Game and Birds in the Territory, Issued May 1925 (emphasis added).

**10.** *See* 50 C.F.R. § 91.3 (1944), *printed at* 9 Fed. Reg. 5270, 5271 (1944):
*Taking animals, birds, and game fishes in emergencies.* An Indian or Eskimo, or an explorer, prospector, or traveler, may take ani-

tion resolved the ambiguity that previously existed. Although we give less deference to a subsequent agency interpretation which conflicts with that agency's contemporaneous interpretation, *see Watt v. Alaska,* 451 U.S. 259, 273, 101 S.Ct. 1673, 1681, 68 L.Ed.2d 80 (1981), *General Elec. Co. v. Gilbert,* 429 U.S. 125, 143, 97 S.Ct. 401, 411, 50 L.Ed.2d 343 (1976), we do not believe that this case is one in which we need question the later interpretation. The revised regulation continued in force for the next sixteen years with only minor modifications. There is no evidence that the change in the regulation resulted from a changed interpretation of the 1925 AGL. Rather, it is likely that the revised regulation simply clarified the interpretation given to the statute initially.

Third, administrative action at the time Alaska became a state shows that both the agency and Congress believed that the MBTA governed subsistence hunting of migratory game birds in Alaska. Although the Alaska Statehood Act, Pub.L. 85–508, 72 Stat. 339 (1958), *reprinted at* 48 U.S.C. prec. § 21, did not expressly repeal the 1925 AGL, the 1925 AGL was considered repealed under a general repealing clause. *See* 72 Stat. 339, § 8(d); *see also* Executive Order No. 10,857, 25 Fed.Reg. 33 § 1 (1960) (stating that functions performed by the United States would cease to be performed as of Dec. 31, 1959); Proposed Rulemaking: General Revision of Fish and Wildlife Regulations, 25 Fed.Reg. 7681, (1960) (stating that the 1925 AGL's implementing regulations would be deleted because they were "superceded by operation of the Alaska Statehood Act"). We find no evidence that the repeal of the 1925 AGL authorized the State of Alaska to regulate the hunting of migratory game birds by Alaskan Natives. The federal government continued to regulate the subsistence hunting of migratory birds pursuant to the MBTA based on its belief that it had always had this authority.

We hold that the MBTA was not superseded in Alaska by the 1925 Alaska Game Law. The subsistence hunting provision in the 1925 AGL prohibited the adoption of regulations restricting subsistence hunting of animals and non-migratory birds in Alaska. Thus, the MBTA and not the 1925 AGL governs the hunting of migratory birds. The MBTA permits the Secretary to adopt regulations permitting subsistence hunting only to the extent that the hunting is permissible under the treaties with Canada, Mexico, Japan, and the Soviet Union. We reverse and remand to the district court to determine whether the Hooper Bay Agreement and the 1985 Goose Management Plan are contrary to the MBTA.

### CONCLUSION

We conclude that the Conservation Fund has standing to bring this action. This action is not moot, but our jurisdiction is limited under the APA to a review of the authority of the Fish and Wildlife Service to enter into the Hooper Bay Agreement and the 1985 Goose Management Plan.

We hold that the MBTA governs the subsistence hunting of migratory birds in Alaska. The MBTA was not superceded by the 1925 AGL. As in force today, the MBTA permits the Secretary of Interior to adopt regulations permitting subsistence hunting of migratory game birds. These regulations may not, however, contravene the treaties with Canada, Japan, Mexico, or the Soviet Union. To the extent that the Hooper Bay Agreement and the 1985 Goose Management Plan conflict with the provisions of the four treaties, they are invalid.

REVERSED and REMANDED.

mals, *birds except migratory birds,* or game fishes in any part of the Territory at any time for food when in need thereof and other sufficient food is not available, but he shall not transport or sell any animal, bird, game fish or part thereof so taken, and an Indian or Eskimo also may take, possess, and transport, at any time, auks, auklets, guillemots, murres, and puffins and their eggs for food, and their skins for clothing for his own use and that of his immediate family.
(emphasis added).